STEVEN N. BERGER, SBA #009613
PATRICK A. CLISHAM, SBA #023154
**ENGELMAN BERGER, P.C.**
3636 NORTH CENTRAL AVENUE, SUITE 700
PHOENIX, ARIZONA 85012
———————
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: snb@eblawyers.com
Email: pac@eblawyers.com
———————

Proposed Attorneys for Debtor
SWA Baseline, LLC

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re<br><br>SWA BASELINE, LLC,<br><br>EIN: 20-2519231<br>                              Debtor. | Chapter 11<br><br>Case No.: 4:14-bk-001418-BMW<br><br>**DECLARATION OF ANDREW J. BRIEFER IN SUPPORT OF CHAPTER 11 BANKRUPTCY PETITION** |

I, Andrew J. Briefer, hereby declare under penalty of perjury that the following statements are true and correct to the best of my information, knowledge and belief:

1. I am a principal of SWA Baseline, LLC, the debtor and debtor-in-possession in the above bankruptcy case ("Debtor") and its designated debtor representative in this chapter 11 proceeding. As such I have the authority to make this declaration on behalf of Debtor. I am thoroughly familiar with all aspects and operations of Debtor and am familiar with its business affairs, assets and liabilities, and its books and records.

2. I submit this Declaration in support of Debtor's chapter 11 bankruptcy petition and a series of related motions filed or to be filed by Debtor in connection with its bankruptcy proceedings (the "Motions"). Unless required otherwise by the context, all capitalized terms used herein shall have the same meaning ascribed to them in the Motions.

3. My counsel has attempted telephonic contact with the U.S. Trustee's Office respecting the items contained herein.

**A.  My Professional Background**

4. I am an experienced real estate professional with more than 34 years of combined experience as a commercial real estate appraiser, developer and broker.

5. I am the founder, President and CEO of Indevco Partners, Inc., a real estate investment and development company in Tucson, Arizona ("Indevco").

6. I hold a Bachelor of Science in Business Administration degree from the University of Arizona with a double major in Finance and Real Estate.

7. I am a Member and have been a Member of the Appraisal Institute (MAI) since 1988.

8. I am a licensed Real Estate Broker in the state of Arizona, and I am a Member of the Tucson Board of Realtors and the National Association of Realtors.

9. Through Indevco, I personally managed the acquisition and development of Debtor's 14.53 acre business campus located at 708 West Baseline Road in Mesa, Arizona (the "Campus"), including, without limitation, the financing, leasing, and construction and design of the Campus.

10. Since development of the Campus was completed in 2006, through Indevco, I have acted as the property manager of the Campus for the benefit of Debtor.

**B.  Background of Debtor**

11. Debtor is an Arizona limited liability company with its principal place of business in Tucson, Arizona.

12. Debtor owns and operates the Campus as its primary asset.

13. Debtor acquired the Campus as raw land in approximately 2005 in order to develop a build-to-suit state of the art corporate headquarters, operations and maintenance facility for Southwest Ambulance, a division of Rural Metro Corporation ("Rural Metro").

14. Debtor developed the Campus in 2006 by constructing four structures and related parking on the Campus (the "Building Improvements") including:

  A. A 13,686, square foot class-A executive and administrative offices building on the Southwest Corner of the Campus (the "Executive Building");

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

B.  A 19,989 square foot class-A training and operations center on the Southeast corner of the Campus (the "Training Facility");

C.  A 36,237 square foot flexible warehouse/office building on the Northeast corner of the Campus ("Warehouse/Office Building); and

D.  A 50,758 square foot state-of-the-art maintenance/warehouse facility on the Northwest corner of the Campus ("Maintenance Facility").

15. An aerial photograph depicting the Campus and the locations of the Building Improvements is attached as **Exhibit 1**.

16. Debtor's acquisition and construction of the Campus was financed through initial capital contributions of the members of Debtor and by construction financing that was ultimately refinanced for Debtor by Alliance Bank of Arizona ("Alliance").

17. Debtor's construction of the Campus was completed in approximately 2006 whereupon Rural Metro relocated its Southwest Ambulance corporate headquarters and Arizona operations center to the Campus pursuant to the terms of a lease agreement (the "Rural Metro Lease"), the initial term of which was 10 years with two options for Rural Metro to renew for additional 10 year periods.

**C.  Design and Function of Campus**

18. Although the Campus was developed for Rural Metro's use pursuant to the Rural Metro Lease, Debtor and its architects and engineers specifically designed the Campus and Building Improvements with an eye towards lease expiration and ensuring that the Campus would serve alternative uses if and when Rural Metro moved on from the site.

19. Specifically, because the Campus is surrounded by roads and is accessible on three sides, each of the Building Improvements were designed to be easily retrofitted and utilized as stand-alone properties, with street-front facade improvements to facilitate adjacent roadside access and multi-tenant uses.

20. As an example, the Warehouse/Office Building was utilized by Rural Metro as a single-story warehouse facility with limited office space but it was designed by Debtor and

constructed to be retrofitted and expanded to serve as a more than 49,000 square foot office building, including the addition of second story of office suites for which foundational and structural support has already been included in the initial construction, and which is fully accessible from the road and entrances to the North of the Campus.

**D.  Debtor's Debt Structure**

21.  The Campus was original developed with an equity investment of approximately $3.9 million from Debtor's members and a construction loan and subsequent term loan that were ultimately refinanced by Alliance in June of 2011 in the amount of $18.6 million (the "Alliance Loan").  At the time, Alliance obtained an appraisal indicating that the Campus was valued at more than $26 million (the "Alliance 2011 Appraisal").  A true and correct copy of the Alliance 2011 Appraisal is attached as **Exhibit 2**.  As of the Petition Date, Debtor's balance due to Alliance on account of the Alliance Loan is approximately $16.6 million.

22.  The Alliance Loan is structured as a 10-year term loan with non-default interest currently accruing at a rate of 5.75 percent and with principal and interest payments amortized over a period of 15 years.  The Alliance Loan is also structured to provide Debtor with an 11 month period of interest only payments mid-term, at the expiration of the Rural Metro Lease and in the event that Rural Metro elected not to renew the Rural Metro Lease at the expiration of its initial 10-year term.

23.  Alliance claims a security interest in and to the Campus and of the personal and real property improvements located thereon as collateral to secure the repayment of the Alliance Loan.

24.  Alliance also asserts a security interest in and to the rents and income derived from the Campus (the "Cash Collateral").

25.  In addition, Alliance is currently holding approximately $500,000 in funds in a Debtor account that are reserved for tenant improvements and related expenses at the Campus under the terms of the Alliance Loan (the "Reserve Funds").

26.  According to an updated appraisal obtained by Alliance and dated as of December 23, 2013, the Campus has a value ranging between $12.7 and $17.3 million. A true and correct copy of the Alliance 2013 Appraisal is attached as **Exhibit 3**.

27. Debtor believes that the Campus has a current value of at least $16.9 million.

28. In addition to the security interests pledged to Alliance by Debtor, certain of Debtor's members have guaranteed a portion Debtor's obligations under the Alliance Loan (the "Guarantors").

**E.      Events Leading to Bankruptcy**

29. On August 4, 2013, Rural Metro and its affiliated entities filed for bankruptcy relief under chapter 11.

30. Debtor became aware of the bankruptcy filing shortly thereafter and immediately advised Alliance of the bankruptcy and the possibility that its filing could impact the Rural Metro Lease and the Campus.

31. Thereafter, Debtor remained in close contact with both Rural Metro and Alliance, and in approximately October 2013, Debtor was approached by Rural Metro to renegotiate the terms of the Rural Metro Lease. Discussions about modified lease terms followed but were ultimately unsuccessful.

32. On approximately December 2, 2013, in anticipation of a possible Rural Metro Lease rejection, Debtor and its representatives met with Alliance and advised Alliance that it appeared likely that Rural Metro would reject the Rural Metro Lease.

33. Debtor also discussed with Alliance of its plans and immediate efforts to mitigate the impact of a possible rejection, including, among other things the possibility of splitting up the Campus, and selling and/or leasing the Campus to multiple tenants. Debtor believed (and still believes) that by marketing the Campus for both multi-tenant and single tenant uses, it could mitigate the impact of the Rural Metro Lease rejection and maximize the value of the Campus for the purpose of satisfying the Alliance Loan.

34. Rural Metro formally rejected the Rural Metro Lease in mid-December 2013 and vacated the Campus as of December 31, 2013.

35. Subsequently, Debtor filed a proof of claim in the Rural Metro bankruptcy proceeding for rejection damages resulting from the Rural Metro Lease rejection totaling $2,673,774.60 and has separately filed a request for an administrative claim of $67,939.18 for amounts incurred but not paid

by Rural Metro under the Rural Metro lease during its chapter 11 case.

36. Rural Metro's chapter 11 bankruptcy plan has been confirmed and Debtor anticipates payment of more than $260,000 on account of its rejection damages claim and payment in full of its administrative claim during the first half of 2014.

37. Debtor has since retained Jones Lang LaSalle Americas, Inc. ("Jones Lang") to act as its commercial real estate broker and market the Campus for sale and lease and has undertaken efforts to raise capital from its members to support the Campus during a marketing period.

38. Jones Lang has marketed the Campus as available for approximately 35 days since Rural Metro vacated the Campus and Debtor has begun to undertake certain improvements at the Campus to ensure that the Campus is attractive and maintained to prospective interested parties.

39. Debtor's efforts in this limited time have already been fruitful as Debtor is currently in negotiations to lease the Maintenance Facility to a Fortune 500 tenant and multiple potential tenants have toured and expressed interest in the remaining Building Improvements.

40. Debtor timely made its scheduled principal and interest payments to Alliance for December 2013 and January 2014 in anticipation that Alliance would cooperate with Debtor's efforts and provide Debtor with some limited relief to facilitate Debtor's marketing of the Campus and the acquisition of replacement tenants.

41. Indeed, despite Debtor's efforts and despite the lack of any monetary default by Debtor, on January 13, 2014, Debtor received a notice from Alliance advising that Debtor was in breach of its covenant in the Alliance Loan documents requiring that a 75% loan to value ratio be maintained and demanding that Debtor and the Guarantors pay Alliance $6,977,963.77 on or before February 12, 2014 in order to avoid a default under the terms of the Alliance Loan. A true and correct copy of Alliance's January 13, 2014 notice to Debtor is attached as **Exhibit 4.**

42. Alliance's precipitous actions have denied Debtor any meaningful opportunity or ability to address the Rural Metro Lease rejection and maximize the value of the Campus for the benefit of Alliance and Debtor's other creditor's and interest holders.

43. Debtor filed this chapter 11 proceeding prior to any default under the terms of the Alliance Loan in order to protect its equity holders from the precipitous loss of their nearly $4.0 million in equity as a result of a foreclosure or other premature enforcement actions by Alliance and to provide Debtor with an opportunity to mitigate the impact of the Rural Metro Lease rejection and maximize the value of the Campus.

44. Debtor anticipates that, with financial support of the Guarantors, Debtor can propose a plan to either satisfy the Alliance Loan through a dirt-for-debt plan or restructure the Alliance Loan terms so that Alliance and its other creditors may be paid in full over time.

**F.  Debtor's Motions**

45. Debtor has filed or will shortly file a series of motions seeking relief from the Court in order to facilitate the administration of its chapter 11 case, including:

- A motion for authority to use cash collateral and fund payment of budget items necessary to maintain and preserve the Campus (the "Cash Collateral Motion");
- A motion to establish procedures for payment of utility deposits and for a determination that affected utility providers are adequately protected (the "Utilities Motion"); and
- A series of applications to employ certain professionals for Debtor's estate (the "Employment Applications");

**(i)  Cash Collateral Motion**

46. As of the Petition Date, Debtor held approximately $78,000 of Cash Collateral on deposit in its operating accounts.

47. Debtor requires the use of Cash Collateral to, among other things, pay ongoing maintenance expenses, utilities and fees and expenses related to the Campus. Debtor requires continued and ongoing use of cash collateral in order to fund such obligations of Debtor while it formulates and pursues its plan of reorganization.

48. Debtor proposes to use the Cash Collateral in accordance with the Budget attached to the Cash Collateral Motion at Exhibit A.

49. Debtor asserts that Alliance's interests in the Cash Collateral will be adequately protected by the equity in the Campus as supported by the Alliance 2013 Appraisal, Debtor's ongoing maintenance of the Campus as proposed in the Budget, and the stabilized and improving market for the Campus.

**(ii) Utilities Motion**

50. As more fully described in the Utilities Motion, Debtor only recently established utilities service in Debtor's name following Rural Metro vacating the Campus.

51. Debtor's primary Utility Companies include its electric provider, SRP, its water and sewer service provider, the City of Mesa ("Mesa"), and its telecommunications provider, CenturyLink.

52. Debtor has only recently received its initial billings for electric service at each of the Building Improvements from SRP. SRP's initial statements included billing for actual service for the month of January 2014 and requested deposits on each of the applicable SRP accounts as follows:

| Building Improvement | SRP Account No. | January Service Fees | SRP Deposit |
|---|---|---|---|
| Executive Building | 144-305-001 | $899.70 | $909.00 |
| Training Facility | 105-295-006 | $854.06 | $1,428.00 |
| Warehouse/Office Building | 267-845-003 | $1,290.56 | $2,028.00 |
| Maintenance Facility | 796-095-005 | $658.97 | $3,258.00 |

53. The amounts of the January Service Fees reflect what Debtor reasonably believes will be the average amounts of electric service fees incurred with SRP in the future. Because the Building Improvements are now vacant, use of electric for heat, air conditioning and related systems is limited.

54. On information and belief, the Deposit request for each of the SRP accounts is based, at least in part, on historical uses of the Building Improvements while Rural Metro was in tenancy.

55. With regard to SRP, Debtor proposes to pay SRP the following deposits for each SRP Account (the "SRP Deposits"):

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

| **Building Improvement** | **SRP Account No.** | **Deposit Proposed** |
|---|---|---|
| Executive Building | 144-305-001 | $900.00 |
| Training Facility | 105-295-006 | $850.00 |
| Warehouse/Office Building | 267-845-003 | $1,300.00 |
| Maintenance Facility | 796-095-005 | $650.00 |

56. The proposed SRP Deposits for each SRP account are generally equal to the SRP January bills received by Debtor and should represent a deposit of approximately one month's service fees for each account with SRP.

57. As of the Petition Date, Debtor had not received any bills from Mesa for sewer and water services utilized since Rural Metro vacated the Campus on December 31, 2013, other than initial bills for service fees incurred in establishing such services in Debtor's name. Similarly, Debtor had not yet received its first month's billing from CenturyLink related to telecommunications services at the Property.

58. With regard to Mesa, Debtor proposes to pay Mesa a security deposit in an amount equal to the January billing on each account received from Mesa, which Debtor anticipates receiving with approximately 10 days after the Petition Date (the "Mesa Deposits").

59. With regard to CenturyLink, Debtor proposes to Pay CenturyLink a deposit of $400, an amount approximately equal to the monthly service fees for the telecommunications lines at the Campus ("CenturyLink Deposit").

60. The proposed Mesa Deposits and CenturyLink Deposit should generally represent a deposit of approximately one month's service fees for services on each account Debtor holds with Mesa and CenturyLink, respectively.

61. Uninterrupted utility service is critical to maintain the Campus. If utility companies cease providing service to Debtor, the Campus would be put at risk, thus jeopardizing the success of Debtor's reorganization.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

62. Moreover, as the utility companies will be paid in full for any post-petition services they provide to Debtor, they will not suffer any harm from the relief requested in this Motion.

**(iii) Employment of Professionals**

63. In order to administer its chapter 11 bankruptcy case, Debtor requires the assistance of professionals including, bankruptcy counsel, a commercial real estate broker, and, potentially, expert consultants that may testify as witnesses in any trial that may be conducted in this chapter 11 proceeding.

64. Subject to Court approval, Debtor has retained the law firm of Engelman Berger, P.C. ("EB") as its bankruptcy counsel.

65. EB and its professionals are experienced in representing chapter 11 debtors and are well-qualified to serve as bankruptcy counsel to Debtor.

66. Debtor paid EB a prepetition retainer of $175,000, from which EB has agreed that it shall, subject to availability at the time, fund retainers and fees of any consulting expert and expert witnesses required in this chapter 11 case, up to a maximum amount of $25,000 (with Debtor responsible for any amounts incurred with such professionals in excess of $25,000).

67. Subject to Court approval, Debtor has retained Jones Lang as its commercial broker to market the Campus for sale and/or lease.

68. Jones Lang is a nationally recognized commercial real estate broker with experience marketing and leasing properties of comparable scale and quality as the Campus.

69. Debtor may require additional support from professionals to prepare and prosecute Debtor's reorganization. Any retention of such professionals will be done by subsequent application when and if required.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

**DATED** this 11th day of February, 2014.

            */s/ Andrew J. Briefer*
            Andrew J. Briefer

**COPY** of the foregoing e-mailed
this 11th day of February, 2014, to:

Elizabeth C. Amorosi
Office of the U.S. Trustee
230 North First Avenue, Suite 204
Phoenix, Arizona 85003-1706
**Via Email: USTPRegion14.PX.ECF@USDOJ.GOV**

Craig K. Williams
Snell & Wilmer
400 E. Van Buren St., #1900
Phoenix, AZ 85004-2202
**Via Email: ckwilliams@swlaw.com**

*/s/ Kristine L. Mitchell*

{0005096.0000/00489666.DOC / 7}